of Collins by Richard Davidson and Rota Staker, Eppole by Michael Wendt. May it please the court. Your honors, I am Richard Davidson from Davenport. I represent Mr. Staker, one of the parties in this case. The issue that we have here today involves part of the resolution of a 30 year marriage and the property distribution that was made by the circuit court. The issue here today involves Section 503C, which is the right of reimbursement when there was an alleged contribution by the marital estate to the non-marital estate of Mr. Staker. The alleged contribution was to a farm corporation that Mr. Staker owns a one-third interest in. Mr. Staker owns one-third of Stakers Acres Incorporated, which is a corporation, two-thirds of which are owned by his father and his brother. They have farmed together and it was not disputed at trial that the stock in Stakers Acres was a pre-marital asset and thus not subject to distribution. That being said, it was also stipulated at trial that although it was non-marital property that Mrs. Staker could seek a right of reimbursement under Section 503C2 should she have chosen to do so. And she did present evidence and made arguments regarding a right of reimbursement on two issues. Those two issues are whether or not Mr. Staker received reasonable compensation for the personal services that he provided to the corporation during the marriage. And secondly, whether the corporation paid an adequate amount of rent for farmland that the parties Mr. and Mrs. Staker owned individually outside of the corporation. Looking at Section 503C2, the burden of proof is on the party seeking reimbursement, Mrs. Staker in this case. She has to prove all of the elements of the right of reimbursement. Mr. Staker is not required to prove anything and certainly does not have to prove a negative. The elements of proof of the right of reimbursement for the first issue relating to Mr. Staker's personal services, and certainly he worked at the farm, worked with his brother and his father throughout the marriage and provided those services and received compensation. The compensation he received was both cash and fringe benefits. And the fighting issue on the compensation of Mr. Staker is regarding the value of his fringe benefits. So looking at 503C2, the required elements are that Mr. Staker has provided substantial effort to the non-marital property. We agree with that. He worked there full time. He worked hard. That element is met. The second element is that Mr. Staker's personal efforts resulted in the substantial appreciation of the value of his stock. That we don't think Mrs. Staker has carried her burden of proof. They presented evidence that the value of the corporation increased over the course of the marriage, but they didn't present any evidence that the court could make a reasonable conclusion that that increase was something different than just the natural appreciation of farmland. And the corporation does own three farms. Those farms undoubtedly appreciated during the course of the marriage. And the evidence that we would point to and ask the court to consider is Mr. and Mrs. Staker owned another farm outside of the corporation called the England Farm. They bought it in 1989 for $70,000. At the time of trial, we agreed that the value of that farm was $1,045,000, a 1,300% increase over that 25-year period. The court, in determining whether or not substantial appreciation was the result of Mr. Staker's personal efforts, has to put aside natural inflation, increases in value, increases that occurred by reason of efforts of other people, his father and his brother, and look at whether Mr. Staker's personal efforts caused that increase in value. It would be our position, Your Honor, that there was a failure of proof. The fact that the value of the stock in the corporation went up doesn't mean that Mr. Staker caused it to go up. It means that farmland has been on a tremendous appreciation run over the past 25 years up to the time of trial in 2014. There was no evidence that the value of the corporation increased by anything other than external factors to the efforts of Mr. Staker. Let's say we get past that point, that the court says, well, we'll accept the circuit court's determination that his efforts resulted in substantial appreciation. The next element that Broder has to prove is that Mr. Staker was not reasonably compensated for the services that he provided. The Warey's case that we've cited in our materials states that it is her burden, and she is required to show that he received unreasonably low compensation. Not that he could have been paid more, not that he should have been paid more, but that he was receiving unreasonably low compensation. Mrs. Staker presented the testimony of an accountant, Mr. Meyer. Mr. Meyer testified about his calculations of what Mr. Staker earned and the compensation that he received from the corporation. Looking at that, we think there are two just fundamental errors that Mr. Meyer made that the circuit court did not correct. Firstly, when he computed Mr. Staker's compensation, he included the cash wages that he received and he included the value, the cost of the fringe benefits that he received. But for some reason, he didn't include the value of the health insurance that the corporation paid for the Staker family. The parties had three children, so there were five people total. The corporation paid $9,379 per year for health insurance for the Staker family. How is that a corporate debt? The $9,379? Why was the corporation paying for the insurance of the family members that didn't work for the corporation? Because Mr. Staker was an employee and they provided not only cash wages but fringe benefits to the employees of the corporation and that included family medical coverage, Your Honor. They provided health care. They provided health care insurance. Correct. At no cost to Mr. Staker. They paid the whole bill for the health insurance. But for some reason, when Mr. Meyer was computing the value of Mr. Staker's wages and benefits, he left that off. It's just not there. The number is zero. He included the value of the rental housing that was provided by the corporation. He included the value of the life insurance that was provided as a fringe benefit by the corporation. He included the value of the gasoline that the corporation provided for the family's personal use. But for some reason, he did not include the value of the health insurance. And we would argue, Your Honor, that that is against the manifest weight of the evidence. That just to leave off one whole category of benefit, that certainly if the family had not received health insurance through the corporation, they would have had to dig into their pockets and go out and purchase that themselves and would have certainly incurred at least as much expense in doing so. So our view, Your Honor, is the evidence was undisputed. The corporation provided that as a benefit to Mr. Staker as an employee, as an employee benefit. And the failure of the accountant to include that in the value of what he was compensated for is something that should have been included. And the circuit court should have found that that number should have been added back. And, in fact, if we add that number back, a very substantial change in the reimbursement for the undercompensation takes place. The $450,000 number shrinks by about half if you simply add back 25 years of health insurance at the way that the accountant did it. And that's my second point. Failure to include the health insurance was against the manifest way of the evidence. Secondly, when the accountant computed what he called the reasonable value of Mike's compensation, he used a figure of $20 an hour. He said that Mike should have earned $20 an hour, and he compared that to what Mike did receive in wages and benefits. Using that $20 an hour figure, the accountant determined, based on Exhibit 29, page 7, and this is the exact number the circuit court used, that the undercompensation was $450,962. But the problem is, and the accountant even admitted in his testimony that to compare apples to apples, what he did was he took Mike's benefits today, and he said that today they're worth $18,000 a year. He said, but I don't know what they were worth for the past 25 years, so what I'm going to do is I'm going to deflate that for inflation. I'm going to subtract the amount of inflation that would have accrued on those benefits going backwards 25 years. Perfectly reasonable. But he didn't do the same thing with the $20 in wages that he attributed to Mike at the time of the trial. And he admitted in his testimony that that creates apples to oranges. You can't compare the benefits that he has deflated at the rate of inflation going backwards over a 25-year period with $20 an hour that he's using the same $20 an hour in 1987, 1989, 1992, 1995, all the way up through 2014 without deflating. So in other words, he's saying that beginning back in 1985, he was making on a 2,000-hour work year, making $40,000, and he was still making $40,000 on the day of the litigation? Correct. And actually what he did was he said $20 an hour times, and he used $2,592. So he was figuring not the 40-hour work week. Correct. A little more, yeah. And that was based on some testimony of Mr. Staker at trial, and he worked long hours. So neither inflated nor deflated. The $20 an hour. Correct. Never went up, never went down. But he did reduce the value of the fringe benefits over that same 25-year period. So at the time of trial, he valued the fringe benefits at $18,940. But looking backwards to 1987, he had cut that in half to $9,570. So you're comparing $0.50 to $0.01 when you go backwards in 1987. You either have to not deflate anything or you have to deflate everything by the rate of inflation. And, Your Honor, this is just, these are simple mathematical computations that, you know, I certainly would not expect the circuit court to make, but I would certainly expect the circuit court to determine in its ruling that when you're comparing $20 an hour in 2014 to $20 an hour in 1987, it's not the same thing. And that if you make that simple adjustment and adjust that $20 an hour at the same rate of inflation going backwards, the way he did with the benefits, what that does is that subtracts $306,000 from the $450,000 reimbursement number. Do you have anywhere what that deflated figure would have been in 1985 for a $20 an hour wage rate at the time of this litigation? I don't believe there is something in the record other than the Exhibit 29, which shows the percentages of the number that is computed backwards in Exhibit 29, page 7. And again, it's just percentages, Your Honor. If you take $18,940 and divide it by $9,570, that's the reduction backwards over those 25 years. You take the same $20 number and you reduce it by that same percentage, it's about 50%. It's probably $10. It's approximately 50% reduction over the 25-year period. And your argument is that he's properly classified by his wage rate as labor as opposed to farm manager. Correct. And that wasn't really disputed. Mr. Meyer testified that he didn't classify him as a farm manager, that he was a farm worker, that he made approximately $10 an hour when he worked at another job at a concrete company during the same number of years. So roughly $10 an hour, we think, was his reasonable compensation. But even using the $20 that Rode uses, if you just compare the apples to the oranges, you come up with this inflated figure of $450,000. Same problem with the rent. The rent that was used at trial, Rode testified that $250 an acre would be more than fair. The expert whose appraisal was stipulated determined the rental value of the farm at $188 an acre. The corporation paid $129 an acre plus $31 in taxes for a total of $160 an acre. With that testimony, then, the court determined... For tillable only or non-tillable? Tillable only, sir. Tillable only. 92 acres of tillable ground. The circuit court used $339 an acre off a printout that Mr. Meyer got from the University of Illinois. Mr. Meyer is not an appraiser. He could not testify or verify that that figure was correct. Certainly, Rode is competent to testify to the value. She's one of the owners. Certainly, the appraiser, who appraised it at $188, is one of the owners, is competent to testify. And so, again, we have the same problem. We're comparing a number that came off the Internet by a non-expert to figures that were testified to by an expert and figures that were testified to by the owners. If you look at those two numbers, the difference is less than 10%. Hardly worth arguing about. And you certainly wouldn't be arguing if the court had used those numbers. But, again, we think it's against the manifest weight of the evidence to use a number off the Internet rather than the testimony of the owners and the expert. Thank you for your time. I will await your decision. May it please the Court. Mr. Davidson, co-counsel. My name is Mike Wang. I'm here representing Rode Staker today. I represented Rode through these proceedings for dissolution of marriage. As Mr. Davidson indicated, this is a long marriage. It was 28 years the parties were together and more than 30 years before the parties were divorced. The central issues do relate to the question of reimbursement to the marital estate for contributions made by the marital estate in the form of labor and underpaid rent during the course of the marriage. The primary asset, which is owned by either of the parties, is a corporate interest, a one-third interest in Stakers Acres. I want to clarify a point made by Mr. Davidson. He indicated that this was a premarital corporation. That's not the case. The corporation was formed in 1987. The parties were married in 1983. So it was a non-marital corporation established by gift of the father to the two sons and then the three of them owned one-third interests. That corporation, during the course of its operations, acquired all of the property it owned. That included the acquisition of three farms, machinery, equipment, and materials for operations or farming activities. Why not value his share of the corporation and split that? Because it fairly is characterized as non-marital property. There's some pretty creative business expenses here that would not normally be affiliated with a farm operation, such as putting gas in Roby's car. I don't know. Was it feasible to even make that argument, and would she have come out a lot better? I don't know that she could have created an argument that this was marital property because of its original source. I'm not a tax lawyer, and this case made me glad that I wasn't, because I think that the family probably certainly took all the gray area it could in deducting expenses that one might consider personal. And that's consistent with what this family's goal has always been. When we talk about this corporation, if you look at the testimony of Mike Staker, if you talk about the testimony of Bill Staker, if you talk about the testimony of Rhoda Staker, everyone had in mind, we're going to build this corporation. We're going to make it something strong. We're going to make a legacy for the future. This is for our kids and our grandkids. We will not take much out now, and by doing so, we will build something for the future. This is our retirement, is what Mike said. This is our retirement. Then when the marriage comes apart at the seams some years later, no longer is it their retirement. It's his retirement, and she's got her $86,000 401K plan from the law firm where she works. In looking at the issues that are before the court today, I think it's important to have in mind what it is that the outcome was and what it is that they want the outcome to be. The parties bought a farm, and I think Mr. Davidson said it was $70,000. They paid $80,000 for that farm, and it did appreciate tremendously. But that was the only thing they really owned in addition to two insurance policies and Rhoda's 401K. That's the marital estate, plus whatever contributions have been made to the corporation. So the outcome as it is, is that Rhoda's award amounts to $880,000 consisting of one half of the value of the farm they jointly owned, which was $522,000, an $86,000 401K plan, and the $272,000 of reimbursement that Judge O'Connor ordered paid by husband and wife. Husband comes out of this case as it sits today with assets valued at $1,370,000. Consisting of the farm, the $1,000,000 farm, less the $522,000 he had to pay to Rhoda, his life insurance policies, and all of his corporate interest, which is valued at better than $1,000,000. The corporate interest is actually $1,074,000, at least it was at the time of trial. So even given the reimbursement, these folks started with nothing, and he's a half a million dollars ahead just on the ruling as it was. We tried to be, Mr. Davidson said that the accountant said that the judge should use $20 an hour. The accountant didn't say anything of the kind. He provided information for the court about what would be the figures if it was $20 an hour, what would be the amount of reimbursement if it was $15 an hour, and what it would be if it was $10 an hour. And of course, that has a big impact on what the figure ultimately is. But the recommendation, $20 an hour, that came from me. The question is what's reasonable in these cases, and what's reasonable can differ from person to person. I would submit that if you put this case in front of five different judges, trial judges, to make a decision about what the outcome would be, you would probably have five different outcomes, any one of which could be reasonable. Judge O'Connor indicated this was a close case. I thought perhaps it was less close than the judge did. In the end, he decided that reimbursement was warranted. There's nothing in the statute that describes what must be taken into account in determining what reasonable compensation is. There isn't any metric that tells us how to do that. The Tatham case does indicate or proves this position where one half of gross salary not taken constitutes a fair reimbursement to the marital estate. That is, the full salary is the marital estate, and half of that goes to husband and half of that goes to wife. No deductions for taxes. Much was made of that at trial and in the briefs before you. Are particular expenses supposed to be included in perks and benefits? I can't answer that question. The law that is before the court doesn't tell us that. Most of these cases that have to do with reimbursement for personal effort involve reversal and remandment for determination as to what the value of the personal contribution has been other than the Tatham case. And then there's the question of the burden of proof that applies. It's been said that this is a clear and convincing evidence standard when we're talking about personal contributions. Clear and convincing is a heavy burden. It's not easily met. It applies when we talk about retracing contributions of money or other contributions to a non-marital estate. If there was any doubt about whether it doesn't apply in this, the codifying amendments to the Marriage and Dissolution of Marriage Act that went into effect January 1st should tell us this is not the case. Because it separates out the clear and convincing evidence and attaches it to the tracing. And it separately addresses the question of whether or not there is personal effort, significant personal effort, resulting in substantial appreciation of non-marital property. It's that change that confirms and I think codifies what was always intended. There are two cases cited by Mr. Davidson that arguably involve reference to clear and convincing evidence being applied on a personal contribution case, personal effort case. One of those is Hughes. I would submit that the reference to that standard of proof is DICTA. It was a case involving premarital contribution by a wife toward non-marital property of the husband. And the decision had to do with the inability to obtain reimbursement for contributions made prior to the party being married. As that's the case, it could be no more than DICTA. Well, 503C is pretty clear in terms of it requires significant, the terms of it are significant and results in substantial appreciation of non-marital property. Yes. What was so significant about this gentleman's efforts as either categorized as a farm laborer or a farm manager? Yeah. Is there something unique that he brought to that asset that resulted in substantial appreciation of the value of that asset? Isn't that the real question? I mean, the terms are pretty clear in the act. The substantial appreciation is all the assets that the corporation was able to acquire. Well, if you understand business, which I know you do, most of us do, is where the retained earnings. What was the retained earnings count in that corporation? I don't know. We know that the value of land, just sitting on it doing nothing, resulted in 800% appreciation over those many years. We know that doesn't take any significant effort except just to not sell it. The 800% figure that Mr. Davidson cited relates to the Eaglet Farm, which was owned by the parties. Okay, but it's comparable. We all can take judicial notice, basically, of appreciation of farmland in Illinois. But all it takes to make money is to not sell it. The purchase price in the book value of the farms the corporation owned was $376,000 less than the fair market value in the book. That's at Exhibit 16, page 692. So if you wanted to dissect out a portion of that that's attributable to appreciation in land, that's the portion you're looking for. And the appreciation of the corporation, according to the corporation's books, by 2013 was about $2.5 million. According to Mr. Davidson's expert, Mr. Kilberg, it was about $3.2 million of assets at the time the case was tried. So I think some of it may be attributable to appreciation. Some of it? Some of it. $372,000. How would you come up with that figure again? Book value? Book value, their cost, less the fair market value they listed in their financial statement at Exhibit 16. Is it only $300,000? $372,000. There's a difference. Yes, sir. But if you went out and appraised that farm ground and got what that value was worth in 85 or whatever that beginning year was, okay, what would be more than $300,000? Well, the farms were acquired after 87 and during the course of the marriage. So one of them was acquired during the period of the financial statements we provided in the trial court, and I think two of them were prior to those financial statements, but during the corporate operations. And they're carried, again, at book value and at fair market value on the financial statements. But we're still back down to the significant effort that resulted in substantial appreciation. Sure. Well, Mr. Staker worked, according to Roda's estimate, 2,500 to 3,000 hours a year. That was uncontroverted. He had the opportunity to get up and say, No, that's not true. I didn't work that hard. But he did work that hard. And what he got for that was, in addition to the perks, $1,329 a month every month. And when we talk about changes in the amount of compensation that one might have over the course of 20 years, that didn't change. It was the same amount from the first day he worked for the corporation until the last day. $1,329 a month. That's cash raisers. That's what the check was for. That's cash. Yes, sir. Okay. Free housing. What else? He had a house to live in. He asked for his truck. He had some insurances paid. Health care. Yes, sir. Electricity, he paid for. Utilities. And, of course, some of the utilities were related to farm operations that ran St. Robert's. So what he didn't take away from the corporation was reinvested by the corporation to buy the other farms. There weren't other big, large cash sums donated by Dad, right? That's right. So what he didn't take went back into the corporation. And the corporation bought the farms and grew. And the wife's share. I mean, nobody plans for a divorce, but they were trying to protect the future for the family until the divorce happened. And then she's cut out. Right. They closed ranks, and at that point it was everything had been sufficient and enough. And, you know, there's tremendous growth in this asset. If it's not part of the reimbursement, it's not a part of the marital estate, then it's just that piece of ground they were lucky to buy. And what she got in her 401K and Mike's two life insurance policies. And all these amounts that are paying for the insurance and the gas for her to drive back and forth to her law firm job, those are all deducted, I presume, for tax purposes as corporate expenses. The corporation was aggressive in claiming deductions that it thought it could. You know, I can't tell you what it is. And everybody was okay with that plan. I mean, she was silent as well. Everyone was on board. We will do what we can to build and grow this corporation for the future. As Mike said, this is our retirement. And had the corporation been paying dividends, then there would be more assets for the marital estate to split up. Maybe. Well, it didn't. I know. And so the corporation grew and they got by. Mr. Davidson mentioned the $339 an acre figure. That was, if you look at the Exhibit 29, you'll see that was used once, one year. And that was the figure for good ground that produced 150 to 170 bushels an acre. I think that the amount of, or the opportunity to contest the productivity of that land was available to Mr. Staker, and he didn't do it. Roda's opinion as to the value of the farmland is entitled to some weight. She certainly knows what farmland, she's a farm wife, knows what farmland was cash running for in her community. She also knows that particular piece of land, and it's 92.7 fillable acres. The suggestion that the appraiser's figure, which was a crop share arrangement, should be used instead, first surfaced in the written closing arguments or submissions to Judge O'Connor, wasn't really argued at trial or even discussed at trial. One thing that every witness said is, we will charge less than market rent for this property as a means to grow the value of the corporation. So it was less than market. The question is, did the judge act within his discretion in setting an amount for what the fair market rent should have been? Did the judge act within his discretion in deciding what amount should have been compensated in marital estate for the personal effort, which did result in substantial appreciation? Really all of that wealth was created from the hard work of all three of these people. Man's a hard working man, there's no doubt about it. We're sure it did, and the judge might have gone another way, he might have picked a different hour, he might have included some other expenses, excluded some. He didn't have to, the law doesn't say that he had to include any particular thing or set any particular hour. It only needs to be reasonable. His decision only needs to be governed by a rule of reason. I don't think anyone could say that no reasonable person would do what this trial judge did on the evidence before him. Judge O'Connor gave you $272,000 in reimbursement. What were you hoping for? What were you asking for? That's what I asked for. And that includes both the compensation for the personal effort and for the undervalued cash run on the farm property, which went on for years. It was a minor issue also about not taking into account the real estate taxes paid on that farm property, but Rhoda's testimony was clear that that was for the use of the pasture, otherwise nothing was paid for the use of the pasture, and the corporation used it too. Well, the reimbursement to the Maryland State was more than $272,000 for something, wasn't it? That's correct. The net of the payment to Rhoda was $272,000, which is what I asked for. The reimbursement was $460,000. It was divided basically equally between the two. The reimbursement and all the assets were divided equally. That's what we asked for. That's what the judge did. I'd ask the court to affirm this judgment in all of its particulars. Thank you. Counsel? A few comments, Your Honors, regarding Mr. Wing's presentation. Rhoda did not leave this marriage with a small amount of money. She, if you don't count the $272,000 of marital reimbursement, she leaves the marriage with $608,000. She works as a secretary. Mike works as a farmhand. That's pretty darn good for that family to come up with that kind of value and equity over the course of a 28-year marriage that was dissolved. You're talking about absent the reimbursement. Absent the reimbursement. Correct. To the marital estate. Correct. It's not like she's going to leave this case with nothing. Well, the bottom line is that the law is the law in Section 503C, and that's your argument here, right? That is our argument, Your Honor. It is entirely dependent on this court's interpretation of 503C. And it's not up to me to prove a negative. Mr. Wing's client had the burden to prove that he was undercompensated and by how much. And in the camp case, this very court said that in order to do that, this court has to have evidence of what the value of his services were. It's our view, Your Honor, that there was no testimony concerning the value of his services. He just stood up here and admitted to you that Mr. Meyer did not give his opinion as to the value of his services. He just used $20 an hour as a reference point. And that reference point was then morphed into Mr. Wing's recommendation to the circuit court, and that was the decision of the circuit court was the spreadsheet that Mr. Wing presented during Mr. Meyer's testimony. So we have no expert testimony whatsoever on the value of Mr. Wing's personal services to this corporation other than from, excuse me, Mr. Staker's personal services to this corporation. Other than Mr. Staker's own testimony and some information that both parties presented from the Bureau of Labor Statistics, which were government publications that both parties introduced. We would assert that our publication, where it showed that a farm laborer had an average wage in Mercer County, Illinois of $9 an hour was more indicative of his services that he provided to this corporation. He drove a truck. He fixed machinery. He watered and fed cattle. He sprayed crops. He didn't market grain. He didn't hedge grain on the futures market. He didn't deal with the banks. Who did that? His dad. His father. His father did all that work. My testimony was Mike had no involvement in the management of the farming operation. He was certainly his father's son. His father gave him an equal role with himself and his brother. But his father was the one who kept the books, who marketed the grain, who sold the futures, who dealt with the loans at the banks, who bought and sold the farms. They're all equal owners of the corporation. They're equal owners, correct. The brother, Mr. Staker, Mike Staker, and his father Bill. So it's our view, Your Honor, that Mrs. Staker did not prove the value of his personal services. And if she didn't prove the value of his personal services, there was no way for the circuit court to determine whether or not his personal services were adequately compensated during the marriage. Now, beyond that, we presented evidence that the value of his personal services was at least $48,000 a year, which is more than Mrs. Staker earned at her job as a legal assistant working in Moline. So Mr. Staker, with a high school education, was earning more in wages and benefits than Mrs. Staker got with a college degree working as a legal assistant at a law office in Moline. It seems incongruous here that the circuit court could conclude that Mr. Staker had unreasonably low compensation, that's the standard, based on the fact that the evidence showed that he made approximately $48,000 per year at the time of trial. A big chunk of that was benefits and gasoline for the cars. And we're not here to debate. We're not the IRS. We're here to talk about what they actually got. And they received free housing, free gasoline, free health care, free utilities, free hay and feed for the horses. They virtually paid for nothing other than food with the money that Mr. Staker made and with the wages that Mrs. Staker earned at her job in town. So your position is that the husband should walk away with all the contributions to make this corporation successful and good, all these additions that they decided not to take anything more? Well, I think, Your Honor, and this is an interesting point that I would refer you to, that the tax returns are in the record. Page 635, 648, 665. This corporation made $3,589 in 2010. It made $18,410 in 2011. It made $44,000 in 2012. There were not hundreds of thousands of dollars that were going undistributed to the sheriff. These are farm tax returns. They're farm tax returns. Would you say there's a difference between farm tax returns and maybe other kinds of tax returns? I would agree, Your Honor, that farmers actually by law are permitted to deduct many, many things that other people are not, like the gasoline for their car, like the utilities on their house, like the property taxes on their house. Those are legitimate deductions. They're deductions. These aren't just farms. I mean, you know, if you've ever done taxes, which some of us have. That's not what we're here to do. If you're managing rental property, you have the same apartments in this town. You have the same scheduled deductions as you do on a net. Admittedly, farm tax returns are… It's whether you're self-employed or you're a W-2 earner. You have different forms, and that's the way it works. The issue here is what is the proof and what is Mr. Staker entitled to because of his premarital interest in the farming corporation, the non-marital interest that he received from his father versus what is Mrs. Staker entitled to as part of the reimbursement claim. I'm not saying it's zero, but I don't think it's $583,000. If you just… How much do you think it is? I think it's about $100,500. If you take off the value of the healthcare and you deflate to $20 an hour at the inflation rate, the same way that the accountant did, I think you end up with about… And you take the rent at the number Mrs. Staker testified to, $250 an acre. I think you end up with about $150,000, Your Honor. That's her apartment. Yeah. Pardon me? No, total. She'd get half that. Half of $150,000. Half of $150,000. So she thought she was married to a successful farmer, and you're saying she was married to a simple farmhand. Is that what you're saying? Well, I don't know that we're saying that, Your Honor. I'm saying that the law provides that Mr. Staker's… You want us to view him as a simple farmhand. Well, she didn't… That's the way you want us to view him, not a successful farmer that contributed his efforts to benefit a corporation that everybody is banking on will provide for their retirement. Well, I wouldn't put it that way, Your Honor. All right. I think you and I may disagree. Very good. Thank you, Your Honor. Thank you, counsel. This court will take this matter under advisement and render a decision in a good fashion. Recess for the panel. Thank you. All rise.